

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00289-CV

**LEGEND OAKS-SOUTH SAN ANTONIO, LLC** d/b/a Legend Oaks Healthcare and
Rehabilitation Center—South San Antonio,
Appellant

v.

Emma **MOLINA** on Behalf of the Estate of Adella Rocamontes,
Appellee

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2013-CI-17554
Honorable John D. Gabriel, Jr., Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Karen Angelini, Justice
Luz Elena D. Chapa, Justice
Jason Pulliam, Justice

Delivered and Filed:  February 18, 2015

AFFIRMED

Legend Oaks-South San Antonio, LLC appeals the trial court's order denying its motion to dismiss plaintiff's health care liability claims.  Legend Oaks argues the trial court abused its discretion because the expert was not qualified to render the report and because the report did not adequately address the causal relationship between the alleged breaches in the standard of care and the decedent's death.  We affirm the trial court's order.

BACKGROUND

Adella Rocamontes died on February 21, 2012, after having spent the previous five months in various health care facilities, including three stays at Legend Oaks.

Rocamontes was admitted to Metropolitan Methodist Hospital on September 21, 2011, complaining of abdominal pain radiating to her back and weight loss.[1]  She was eighty-five years old, and her medical history included diagnoses of Type II diabetes, hypertension, permanent pacemaker, hypothyroidism and shingles of the lower extremity, gastroesophageal reflux disease, anemia, peripheral neuropathy, and chronic renal disease.  While a patient at Metropolitan Methodist, Rocamontes suffered a fractured left tibia.  On September 28, she had surgery to repair the fracture.  Wound care orders required cleansing and dressing changes to the surgical incision every other day.

Rocamontes was discharged to Legend Oaks for rehabilitation on October 4, 2011.  On admission to Legend Oaks, Rocamontes had a foley catheter and "Foley care" was ordered every shift.  The pre-admission notes stated dressing changes to the surgical site "shin area" were required every other day.  Rocamontes was not walking and required assistance for transfers and bed mobility.

Rocamontes remained at Legend Oaks for thirty-five days.  Dr. Uribe's report states he found no records documenting Rocamontes's fluid intake and output.  He states that Legend Oaks's records do not contain an assessment of the surgical wound on her left tibia on admission or any nursing notes describing the wound or its appearance during those thirty-five days at Legend

---

[1] Because our review of the adequacy of the expert's report is limited to the four corners of the report, the facts recited in this opinion are taken from the report. *See Peterson Reg'l Med. Ctr. v. O'Connell*, 387 S.W.3d 889, 895-96 (Tex. App.—San Antonio 2012, pet. denied).  We note that Legend Oaks contends the expert has not reviewed all the relevant documents and contends the report contains factual misstatements of the contents of some of the records. Nevertheless, Legend Oaks concedes that for the purpose of this appeal, we assume the facts are as stated in the report. *See id.*

Oaks.[2] Nor are there any wound care records or notes reflecting dressing changes of the surgical wound during this period of time. A non-pressure skin report dated November 7 states the skin surrounding the surgical site was normal.

The following day, November 8, 2011, Rocamontes was transferred to Nix Hospital.[3] Although Legend Oaks's records are unclear about the reason for the transfer, the Nix's records indicate Rocamontes had a severe bladder infection, the surgical wound had pus draining from the incision, and her leg was red and swollen. Cultures of the wound were positive for Methicillin-resistant Staphylococcus aureuis (MRSA) infection.

Rocamontes returned to Legend Oaks on December 8 with orders for Wound Vac dressing changes to the infected surgical wound three times a week. However, eight days later, on December 16, she was found confused and slurring her speech and was taken to the Nix Riverwalk Clinic. Testing revealed Rocamontes had extremely low blood sugar and was severely acidotic, and the admitting diagnosis was severe sepsis. She was also diagnosed with disseminated intravascular coagulation, a condition commonly associated with sepsis, and physician notes stated she had severe sepsis, severe metabolic acidosis, and respiratory failure.

After she was stabilized, Rocamontes was transferred to a hospital with the chief complaints of an unhealed surgical wound with hardware exposure and severe sepsis. She was started on dialysis for renal failure as a result of the infection. The hardware was removed from Rocamontes's infected left leg, and on January 23, 2012, she underwent a skin graft from the lower abdomen and groin area to cover the open wound to her leg.

---

[2] A pressure skin condition report prepared on Rocamontes's admission to Legend Oaks states the surgical site is on Rocamontes's left hip (instead of left tibia) and says the incision is clean. Various notes throughout Rocamontes's first stay at Legend Oaks refer to a surgical wound of the "left hip" and "left thigh" and state that the incision was healed.

[3] According to Dr. Uribe's report, *after* Rocamontes had been transferred to the Nix, Legend Oaks's nursing staff continued to make notes "documenting" that Rocamontes was assisted with bed mobility and transfers and that her skin was within normal limits.

Rocamontes was discharged from Nix Hospital back to Legend Oaks on January 27 with diagnoses of severe sepsis, acute renal failure, and disseminating intravascular coagulation. Physician's orders included cleaning the graft site and surgical site every other day and dialysis three days a week. Dr. Uribe states that it appears from Legend Oaks's records that the nursing staff completely ignored the graft site over the next twelve days while Rocamontes was at the facility.

Legend Oaks's records indicate that on February 2, Rocamontes became short of breath and was given oxygen. She was then sent to the dialysis center for most of the day. However, Legend Oaks's records do not reflect that Rocamontes's treating physician or the dialysis center were notified of her decreased oxygen saturation. Dr. Uribe states the records do not reflect that any effort was made to identify the problem that resulted in her needing oxygen or to initiate a plan of care for Rocamontes regarding administration of oxygen. On February 8, Rocamontes was reported to be lethargic and her oxygen saturation level was low. She was transferred to Nix Hospital, where she was unresponsive on admission. Notes on admission to Nix state the wound at the graft site had heavy serous drainage and the surrounding skin was warm and moist.

Rocamontes's condition continued to deteriorate and she was admitted to hospice care on February 20. She died on February 21, 2012. The death certificate states she died of complications of a tibia fracture.

Emma Molina, as representative of Rocamontes's estate, filed a health care liability suit against Legend Oaks on October 21, 2013. Molina served on Legend Oaks an expert report and a supplemental report prepared by Eduardo Javier Uribe M.D., together with Dr. Uribe's curriculum vitae, within the 120 days required by section 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West Supp. 2014). Dr. Uribe's report asserted that Legend Oaks and its nursing staff breached the standard of care by failing to develop

and implement a comprehensive care plan, failing to properly care for and document Rocamontes's surgical wounds, and failing to provide proper foley catheter care and monitoring. He concluded that these breaches proximately caused Rocamontes to suffer the renal failure and sepsis and caused her death. He further concluded that the nursing staff's failure to develop a comprehensive care plan and properly monitor her condition caused them to fail to identify signs of deterioration or report them, thus delaying Rocamontes's transfer to the hospital until she was in crisis and unable to recover.

Legend Oaks timely objected to Dr. Uribe's qualifications and to the sufficiency of the reports, and moved to dismiss the suit. The trial court heard Legend Oaks's objections to the report and supplemental report and subsequently signed an order overruling the objections and denying the motion to dismiss. Legend Oaks timely appealed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (West 2015).

## THE SECTION 74.351 EXPERT REPORT REQUIREMENT

A health care liability claimant must timely provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West Supp. 2014). The report must provide a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, how the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6). The report must be prepared by a person qualified to testify about the standard of care and the causal relationship between the alleged departure from that standard and the injury, harm, or damages claimed. *Id.* § 74.351(r)(5). The trial court may not dismiss the suit if the report represents a good faith effort to comply with the expert report requirement. *Id.* § 74.351(l); *see Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 51-52 (Tex. 2002) (per curiam). A report constitutes a "good faith effort" if it provides enough detail to inform the defendant of the specific conduct

being questioned and provides a basis for the trial court to conclude the claim has merit. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). The claimant is not required to present evidence in the report as if he were actually litigating the merits. *Palacios*, 46 S.W.3d at 879. And the report may be informal in that the information in the report does not need to meet the same requirements as the evidence offered in a summary judgment proceeding or trial. *Id*. If the report satisfies these requirements as to any one theory of liability, the claimant is entitled to proceed with the suit against the health care provider and the motion to dismiss should be denied. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013).

On appeal, Legend Oaks challenges Dr. Uribe's qualifications as an expert and the sufficiency of his report on the issue of causation. We review the trial court's ruling on Legend Oak's motion to dismiss for an abuse of discretion. *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d at 877.

## QUALIFICATIONS

Legend Oaks argues Dr. Uribe is not qualified to testify about the alleged breaches of the standard of care or about the causal relationship between the alleged breaches and Rocamontes's death. A person may qualify as an expert witness on the issue of whether a health care provider that is not an individual departed from accepted standards of care if the person (1) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim and (2) is qualified on the basis of training or experience to offer an expert opinion regarding those standards. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(B) (West Supp. 2014); § 74.402(b) (West 2011). In determining if the witness is qualified on the basis of training and experience, the court considers whether the witness (1) is certified by a licensing agency of one or more states of the United States or a national professional

certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and (2) is actively practicing health care in rendering health care services relevant to the claim. *Id.* § 74.402(c).

In order to give opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, an expert must be "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." *Id.* § 74.351(r)(5)(C); *see also id.* § 74.403(a). Under the Texas Rules of Evidence, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702; *see also Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996). "The qualification of a witness as an expert is within the trial court's discretion. We do not disturb the trial court's discretion absent clear abuse." *Broders*, 924 S.W.2d at 151 (internal citations omitted).

Dr. Uribe's curriculum vitae shows that he has been practicing medicine since 1986. He did his internship in internal medicine and a residency in family practice. Dr. Uribe has been practicing family medicine for his entire career, and he has worked in San Antonio as a hospitalist since 2004. Dr. Uribe's report states that he is Board Eligible for the American Board of Family Practice and that he is currently practicing as a hospitalist with a specialty in family medicine.

Dr. Uribe's report states that a substantial part of his practice involves the treatment of geriatric patients and that he has cared for and supervised the care of hundreds of elderly patients such as Rocamontes with multiple diagnoses, both in nursing homes and in acute care settings. He states that he has provided care for the patients, including evaluating, planning implementation, supervision of nursing staff and evaluation of care. The report states that Dr. Uribe has in the past

and was at the time of the report managing elderly patients with diabetes, hypertension, sick sinus syndrome, pacemakers, shingles, renal disease, and infections, both in long term care and in acute care settings.

The report states that by virtue of his training and experience, Dr. Uribe has knowledge of the standards of post-operative care that should have been provided to Rocamontes. He states he is familiar with the standard of care in Texas applicable to nurses for the diagnosis, assessment and treatment of geriatric residents post-surgery for fractures related to falls and the risks associated with the immobile geriatric resident with multiple diagnoses including diabetes, hypertension, and sick sinus syndrome resulting in permanent pacemaker placement. He also states that he has knowledge of the standard of care for nurses caring for patients at risk for decubitus ulcers and infection of wounds post-operatively, and is qualified to render opinions regarding the provision of Foley catheter care and wound care for nursing home patients similar to Rocamontes.

An expert physician is not required to have practiced in every medical discipline involved in the care of the patient, so long as he has practical knowledge and experience of the standard of care under circumstances similar to those confronting the defendant and in the areas on which he gives his opinion. *See Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). Further, the care and treatment of open wounds and the prevention of infection are subjects "common to and equally recognized and developed in all fields of practice," thus any physician familiar with and experienced in the subject may testify as to the standard of care. *Khan v. Ramsey*, No. 01-12-00169-CV, 2013 WL 1183276, at *5-6 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.); *Keo*, 76 S.W.3d at 732; *Garza v. Keillor*, 623 S.W.2d 669, 671 (Tex. Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) ("[T]he standard of care in the infection process . . . is common to and equal in all fields of medical practice").

The curriculum vitae and report reflect that Dr. Uribe has substantial training and experience in treating, managing the care of, and directing nurses in the care of elderly patients with some of the pre-existing medical conditions that Rocamontes had, both in acute care settings and in nursing homes. The report demonstrates his familiarity with the nursing standard of care for preparing and implementing a plan of care for a patient such as Rocamontes, for preventing ulcers and infections, and for providing foley catheter care. And, the report and curriculum vitae reflect that at the time the claim arose and the report was prepared, Dr. Uribe was actively practicing health care in rendering health care services relevant to the claim. Based on the reports and curriculum vitae, the trial court could have reasonably found that that Dr. Uribe was qualified to give an expert opinion on the issue of whether Legend Oaks departed from accepted standards of care in this case. *See, e.g.*, *Hillcrest Baptist Med. Ctr. v. Payne*, No. 10-11-00191-CV, 2011 WL 5830469, at *7 (Tex. App.—Waco Nov. 16, 2011, pet. denied) (mem. op.).

When a trial court finds for purposes of chapter 74 that a physician is qualified to give his opinion about the standard of care for a certain procedure, it is reasonable for the trial court to conclude that the physician is qualified to opine on the causal relationship between the failure to meet that standard and the resulting harm. *See id.*; *Whisenant v. Arnett*, 339 S.W.3d 920, 927 (Tex. App.—Dallas 2011, no pet.). Because Dr. Uribe's report demonstrates his training, knowledge, and experience with familiarity with the issues involved in the underlying claim, the trial court also could reasonably have concluded that Dr. Uribe is qualified to state his opinion as to the causation element.

We hold the trial court did not abuse its discretion in denying the motion to dismiss on the ground that Dr. Uribe was not qualified to render the opinions he gave.

## CAUSATION

In its second issue, Legend Oaks argues the trial court should have dismissed the suit because Dr. Uribe's report fails to meet the expert report requirement on the issue of causation. A chapter 74 expert report must provide a fair summary of the expert's opinions regarding the causal relationship between the failure to meet the applicable standards of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). It is not sufficient for the expert to conclusorily opine that the breach caused the injury. *Jelinek*, 328 S.W.3d at 539. He must explain the basis of his statements and link his conclusions to the facts. *Id.* at 540. However, because one of the purposes of the expert report requirement is to provide a basis for the trial court to conclude the claims have merit, the expert report needs to meet the statutory requirements only as to one liability theory. *Certified EMS*, 392 S.W.3d at 630-31. If the expert reports shows that at least one of the alleged theories of liability has expert support, the claim is not frivolous and the entire case should move forward. *Id.* at 631; *see Nexion Health at Duncanville, Inc. v. Ross*, 374 S.W.3d 619, 626 (Tex. App.—Dallas 2012, pet. denied) (holding report need not be sufficient as to, or even address, each specific act of negligence pleaded in order to satisfy expert report requirement).

Dr. Uribe's report addresses Legend Oaks's alleged negligence in three areas: the initiation and implementation of a comprehensive plan of care, wound care, and care for a resident with a foley catheter. He concludes that Legend Oaks's nursing staff's breaches of the standard of care in each of these areas contributed to Rocamontes's death.

Initially, Dr. Uribe explains that the standard of care for the nurses at Legend Oaks included initiating and implementing a comprehensive plan of care for Rocamontes. On admission, the nursing staff should establish a plan of care that identifies the risks unique to the resident and specifies the interventions required by staff to proactively care for the resident and meet the goals

of the resident. The plan of care is a "road map" that allows the nursing home to be proactive, provide appropriate interventions, have a tool to communicate with other staff members, and identify and prevent complications. The standard of care then requires implementation of the plan by careful and frequent monitoring of the resident's physical and mental conditions, and assessing and reporting to the treating physician on her ongoing condition and any changes.

The report states that Legend Oaks "breached the standard of care by failing to identify on a systematic plan of care the risk for infection, dehydration, pacemaker identification, hydration needs or increase metabolic needs, clinical conditions and the primary risk factors associated [with] diabetes, infection, foley catheters, wound care, oxygen, dialysis, need for increase in caloric intake, urinary stasis, constipation, or fluid balance with Rocamontes on any of the admissions to Legend Oaks." Dr. Uribe states that Legend Oaks's records are "very poor" and "never reflect concisely or accurately the patient's care" while she was at the facility. The report details numerous instances of Legend Oaks failing to evaluate, monitor, document, or report Rocamontes's status. One such instance was Rocamontes's lethargy and decreased oxygen saturation on February 2, which Dr. Uribe states should have been recognized as a sign of acute septic shock. Because Legend Oaks failed to initiate and implement a comprehensive care plan, the nursing staff failed to identify this acute change in her condition, failed to promptly notify her physician, and failed to adequately respond to it. Dr. Uribe states that prompt treatment of septic shock "was crucial to survival." He concludes that "[t]he failure of the nursing staff at Legend Oaks to identify signs of deterioration and lack of skills in responding to Rocamontes['] acute change in condition, proximately lead [sic] to the delay in transferring her to the hospital . . . and proximately caused her death."

Dr. Uribe's report also states in detail the standard of care for nursing home residents with surgical wounds. He explains that such residents are at high risk of infection and proper wound

care, skin care, and turning are critical to prevent skin breakdown and infection of open wounds. He explains that wounds in the geriatric population heal more slowly than those in younger patients and lists factors such as inadequate nutritional intake, diabetes, and immobility that may delay healing or heighten the risk of infection. The standard of care is for the nursing staff to evaluate and document the surgical site upon admission. Then, at every shift throughout the healing process, the nursing staff should assess and document the skin and any wounds or sores and document a list of measures, including the anatomic location of the wound or sore, the appearance of the wound, to include the size and depth of the incisions, the surrounding skin color and temperature, the surrounding edges, whether there is odor, pain, or tenderness, and whether there is any drainage. The standard of care requires the nursing staff to document and notify the physician at the first signs of infection, which include redness, bogginess of tissue that indicates fluid in the tissue, swelling, and drainage of the wound, lack of tissue growth or regenerations, fever and pain among other signs and symptoms. The standard of care requires wound care and cleaning in accordance with doctor's orders.

The report recites numerous breaches of the standard of care of post-surgical wounds by Legend Oaks at each admission, including failing to properly assess and document the wounds on admission, failing to follow the physician's orders for wound care, and failing to assess and document the condition of the skin and surgical wounds at every shift. Dr. Uribe states that the records of Rocamontes's initial admission to Legend Oaks fail to even identify the surgical site. He also states that it appears from the records that the nursing staff completely ignored the surgical site and the grafting cite when she returned to Legend Oaks. Dr. Uribe states that although wound care was ordered at every admission, the Legend Oaks's nursing staff never properly assessed the correct surgical site and there are no wound care records regarding any cleaning or dressing changes of the surgical wound on her left tibia. The staff failed to perform and document skin and

wound assessments, and failed to timely communicate changes in Rocamontes's physical condition to other staff members or her physician. The day before Rocamontes's first transfer back to the hospital with a red, swollen, draining, and seriously infected surgical wound, the Legend Oaks staff records state the skin surrounding the surgical site was "normal." Dr. Uribe's report states that these breaches in the standard of care proximately caused Rocamontes's surgical wound to become seriously infected and delayed her getting appropriate medical treatment. According to Dr. Uribe, the infection and delayed treatment "proximately caused Rocamontes to die of sepsis secondary to renal failure and colitis."

Rocamontes had a foley catheter when she was admitted to Legend Oaks. Dr. Uribe's report explains that foley catheters are used by patients that are unable to urinate independently, walk to the bathroom, or use a bed pan. Long term use of a foley catheter presents risks of bladder infections and serious ascending infections of the kidneys that can lead to renal damage and failure. The report states that "[b]acteria can be introduced by failure to keep the site clean and dry and by the lack of fluid intake." The standard of care requires the nursing staff to monitor fluid intake and output, encourage fluids, assess and document the color and amount of urine output every shift, and to keep the foley catheter site, including the perineal area, clean and dry.

Dr. Uribe's report states the nursing staff at Legend Oaks breached the standard of care by failing to keep Rocamontes's perineal area clean and by failing to document her fluid intake and urinary output. Dr. Uribe opines that as a result, when she was transferred from Legend Oaks to Nix Hospital on November 8, Rocamontes had a "severe bladder infection due to a virulent pathogen pseudomonas," and this in turn caused Rocamontes to suffer renal failure and was a proximate cause of her death.

Dr. Uribe's report states: "It is clear that this facility failed to follow doctors [sic] orders, failed to document and provide wound care, failed to monitor this patient's dietary and fluid intake,

[and] failed to report changes in the condition of this patient until she was in crisis and had to be transferred to the hospital in critical condition. By the breach in the delineated basic standard of care, this facility proximately caused the untimely death of Adella Rocamontes."

We hold the trial court acted within its discretion to conclude that Dr. Uribe's report represents a good faith effort to provide a fair summary of his opinions regarding the applicable standards of care, the manner in which Legend Oaks failed to meet those standards, and the causal relationship between the failures and the harm claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l), (r)(6). Dr. Uribe's report identifies the acts and failures that breached the standard of care and sufficiently links those breaches to the infection of Rocamontes's surgical wound, her bladder infection, renal failure, and death. The report sufficiently links Dr. Uribe's conclusions to the facts, it gives Legend Oaks fair notice of the plaintiff's complaints against it, and is sufficient to have permitted the trial court to conclude there is merit to one or more of the claims. *See Jelinek*, 328 S.W.3d at 539; *Nexion*, 374 S.W.3d at 626.

## CONCLUSION

Because the trial court did not err in determining Dr. Uribe was qualified as an expert witness and in finding the report met the requirements of an "expert report," the court did not abuse its discretion by overruling Legend Oaks's objections and denying the motion to dismiss. We affirm the trial court's order.

Luz Elena D. Chapa, Justice